# SAILFISH CLUB OF FLORIDA, INC. v. DEPARTMENT OF NATURAL RESOURCES

## Case No. 84-0862R

State of Florida, Division of Administrative Hearings

September 18, 1984

### APPEARANCES OF COUNSEL

**Thomas M. Beason** and **Jon C. Moyle, Moyle, Jones and Flanigan, P.A.,** for petitioner.

**John W. Williams,** Assistant General Counsel, for respondent.

### OPINION

DIANE D. TREMOR, Hearing Officer.

Pursuant to notice, an administrative hearing was held before Diane D. Tremor, Hearing Officer with the Division of Administrative Hearings, on May 9, 1984, in Tallahassee, Florida. Later exhibits and testimony by deposition were filed on June 4, 1984. The issues for determination in this proceeding are whether respondent's existing Rule 16Q-21.05(1)(b)4, Florida Administrative Code, and/or proposed

Rule 16Q-21.11, Florida Administrative Weekly, Vol. 10, No. 8 (February 24, 2984) constitute invalid exercises of delegated legislative authority.

## INTRODUCTION

In support of its position of the invalidity of the challenged rules, petitioner presented he testimony of Ted Forsgren, Chief of the Bureau of State Lands Management, Department of Natural Resources. By way of depositions filed subsequent to the hearing, petitioner also presented the testimony of Donald H. Masterson, General Manager of the Sailfish Club of Florida, Inc.; Robert J. Calloway, offered and accepted as an expert in the field of real estate appraisal; and Joseph Walter Milon, offered and accepted as an expert in the field of economics, with special expertise in the financial structure and performance of Florida marinas. Petitioner's Exhibits 1 through 5 and 7 through 15 were received into evidence. The respondent's case consisted of the cross-examination of petitioner's witnesses.

The prehearing stipulation and the challenged proposed rule, as it appeared in Volume 10, Number 8 of the Florida Administrative Weekly (February 24, 1984), were received into evidence as Hearing Officer's Exhibits 1 and 2.

Subsequent to the close of the hearing, counsel for the parties submitted proposed findings of fact and proposed conclusions of law. To the extent that the parties' proposed findings of fact are not incorporated in this Final Order, they are rejected as being either unsupported by competent substantial evidence, irrelevant or immaterial to the issues in dispute or as constituting legal conclusions as opposed to factual findings.

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced in this proceeding, the following relevant facts are found:

(1) Petitioner Sailfish Club of Florida, Inc. is a nonprofit Florida corporation which operates a 550-member private club in Palm Beach County, Florida. Its facilities include a swimming pool, large dining room, cocktail lounge, private dining rooms, card rooms and a marina with three docks and 62 slips. Petitioner's annual membership dues are $925 per member. The marina docks are constructed over 94,815 square feet of submerged lands owned by the Board of Trustees of the Internal Improvement Trust Fund. The wet slip space comprises 2,531 linear feet. Marina slips are available to members only and are rented at $39.60 per linear foot per year.

199

(2) Prior to March 10, 1970, it was the policy of the Board of Trustees to permit the use of sovereignty submerged lands without charging annual fees. At present, all docks, piers and other structures on sovereignty lands in existence prior to March 10, 1970, are "grandfathered" and are not subject to the current lease requirements until January 1, 1998.

(3) On March 10, 1970, the Board of Trustees adopted a new policy providing for the licensing of private interests desiring to occupy sovereignty lands in conjunction with the operation of marinas, charter boat docks and other commercial mooring facilities. The licenses were to be issued upon payment of no less than two cents per square foot annually for sovereignty land severed from public use, and each license was to be renewable annually after receipt of the appropriate fee.

(4) On August 25, 1970, petitioner and the Board of Trustees entered into a license agreement whereby petitioner was permitted to construct, install and operate a marina and commercial dock facility upon sovereignty lands. Petitioner agreed to pay the Board two cents per square foot of the soverignty lands occupied. Section 5 of the license agreement provided as follows:

"This License shall be renewable annually if the Licensee has complied with all the terms and conditions of this License, including payment of the annual license fee. The license fee for renewal shall be no less than the original fee. The Board shall not increase the license fee by more than 10% in any one renewal term."

Section 6 allows the licensee a 90-day grace period after expiration to renew the license. Most, if not all, license agreements entered into between 1970 and 1975 contain this language. In reliance upon that license agreement, petitioner expended some $205,000.00 for construction of docks and other facilities solely related to the marina function of the Club.

(5) Each year thereafter, beginning in August of 1971, petitioner renewed its license for a period of one year by tendering the license fee of two cents per square foot for the 94,815 square feet of submerged land occupied by the marina. From 1970 until 1980, petitioner paid annual license fees of $1,896.00. Beginning in 1980, the Department started increasing its annual marina license fee by ten percent, as permitted under the license agreement, and petitioner paid the increased annual fee.

(6) Around 1975, the Board of Trustees and DNR discontinued issuing licenses and shifted to leases for the use of sovereignty submerged lands. The form sovereignty submerged land lease agreement provided that "renewal of this lease is at the sole option of the Board of Trustees or its legally designated agent." Nevertheless, the Department continued to renew existing licenses upon the tender of the annual fees.

(7) By letter dated June 30, 1982, the DNR informed petitioner that its marina license fee would increase each year at the rate of ten percent, and suggested that petitioner may wish to convert its license into a five-year lease. Petitioner declined the suggestion and remitted its annual fee for its license. In August of 1983, the petitioner paid to the DNR fees in the amount of $2,776.37 for its 1983-84 annual marina license.

(8) On August 1, 1983, the DNR adopted amendments to Chapter 16Q-21, Florida Administrative Code, which governs sovereignty submerged lands management. The amendment included in the list of activities for which a lease would be required

"Existing licenses upon the date of expiration or renewal." Rule 16Q-21.05(1)(b)4, Florida Administrative Code.

Marina leases were to be handled under the standard lease provisions, which include a term of up to 25 years "renewable at the option of the Board." Rule 16Q-21.08. The annual standard lease fee, as amended in August 1983, was to be computed at a statewide base rate of $0.065 per square foot, with an additional 20% of the lease fee to be charged for the first annual fee, and the per square foot base rate to be revised each year. Marinas open to the public on a first come, first serve basis were permitted a 30% discount per square foot per year. Rule 16Q-21.11(1), Florida Administrative Code (1983 Annual Supplement).

(9) By letter dated November 14, 1983, petitioner was informed by the DNR that due to the new rule amendments, specifically Section 16Q-21.05(1)(b)4 which requires a lease for existing licenses upon the date of expiration or renewal, petitioner would need to obtain a sovereignty submerged land lease in order to continue to legally operate its facility. Petitioner was further informed that its license fee was current until August 25, 1984, and that it would be billed for the difference between the license fee and the new rate required under the lease. The DNR warned petitioner that if it did not receive petitioner's

201

lease application within 90 days, it would assume petitioner no longer desired to maintain the legal use of the facility and would proceed under the removal of structures provisions of petitioner's license. Petitioner did not submit a lease application to the DNR. Had petitioner converted to a lease, the annual lease fee would have been $6,162.98, plus the 20% surcharge of $1,232.59 for the first year of the lease. A $200.00 processing fee would also have been required.

(10) In the February 24, 1984 issue of the Florida Administrative Weekly (Vol. 10, No. 8), the DNR gave notice of its intent to amend Rule 16Q-21.11 relating to standard annual lease fees. The purpose of the amendment is "to establish a framework for more equitable compensation to the Board of Trustees . . . for exclusionary uses of state-owned submerged lands." While the prior rule provided for an annual lease fee computed at a statewide base rate of 40.065 per square foot, the amendment establishes a new formula of seven percent of the "total potential annual revenues from the wet slip rental area or the base fee, whichever is greater." The total potential revenues are to be calculated

"by multiplying the total number of linear feet for rent in the wet slip rental area times the weighted average monthly per linear foot rental times 12. The weighted average per linear foot rental will be derived from the monthly rates (seasonal rates included). Any ancillary charges, such as membership fees, dues, or miscellaneous fees which are required to rent a wet slip, shall also be proportionately factored into the average monthly rate." Rule 16Q-21.11(1)(a)1.

The proposed rule provides that the monthly rental rates used to determine the weighted average will be derived from posted price sheets or other information from the previous year certified as true and correct by the lessee. The calculated rate is to be reviewed and adjusted annually on the anniversary date of the lease. A full copy of the challenged proposed rule is attached to this Order.

(11) In early 1982, the Governor and Cabinet, sitting as the Board of Trustees of the Internal Improvement Trust Fund, appointed a "Blue Ribbon Marina Committee" to review Florida's marina policies and to develop a policy to establish a new formula for submerged land lease fees. The 14-member Committee included representatives of county government, a regional planning agency, environmental interests, marine industries, marina owners, general citizenry, boating interests and developmental interests. The Director of the Florida Sea Grant College Program, Dr. James Cato, served as the Committee's Chairman, and designated DNR personnel served as its staff. After meeting monthly

202

from May through October and holding seven public workshops, the Blue Ribbon Marina Committee issued its final report in January of 1983. It was the final recommendation of the Committee that while there should be some differential charges (i.e., for activities in aquatic preserves, between revenue generating, income related uses and non-revenue generating, non-income related uses), the differential should not be geographic and the method for determining lease fees should be a simple statewide base rate. The committee recommended a base rate of 5 cents per square foot per year, with capped increases tied to the Consumer Price Index.

(12) The Blue Ribbon Marina Committee's recommendations were not accepted by the Board of Trustees. Instead, an interagency task force comprised of the Executive Directors of the DNR, the Department of Revenue and the Governor's Office of Planning and Budgeting, plus staff, was formed to report back to the Board of Trustees with recommendations on fee structures. Without holding any public meetings or listening to witnesses, this task force originated the lease fee formula found in the proposed rule. The task force elected to utilize the "total potential annual revenues from the wet slip rental area" as the basis for its 7% formula, in lieu of a percentage of pure gross revenue approach, primarily to avoid auditing problems. It was believed that it would be too difficult to separate out revenues received from grandfathered structures or other facilities not related strictly to wet slip rentals. In effect, total potential annual revenues were assumed to be identical to actual gross revenues.

(13) The Economic Impact Statement (EIS) prepared for the proposed amendments to Rule 16Q-21.11 estimates in detail the cost to the DNR to implement the new lease fee formula. In estimating the costs to those persons directly affected by the proposed rule, the EIS generally notes that there will be an increase in fees for certain existing and new lessees, makes a broad generalized estimate of an average increase of $378.00 per lease and recognizes that the exact individual lease fee increase will vary greatly among lessees. The EIS notes that increased costs to the boating public utilizing marina facilities could be anticipated. Finding that lease fees based on five to twelve percent of gross revenues are economically viable, the EIS concludes that the proposed rates are economically feasible. The EIS contains no estimate of the effect of the proposed rule upon competition within the marina industry. It is noted in the EIS that submerged land leasing practices utilized in other states were reviewed and a comparison of those practices is attached to the EIS. Of the eleven states reviewed, none utilized a percentage of potential revenue approach. Other practices

**203**

included lease fee structures based upon appraised market value of the adjacent upland, percentages of actual gross revenues, uniform base rates per square foot and flat permit charges.

(14) In Florida, there are considerable variations among commercial marinas as to rental fees charged for wet slips, the level of services provided, utilization or occupancy rates, services and amenities located on the upland property and costs of operation, taxes, insurance and utilities. Wet slip rental rates are generally based not only upon the value of the submerged land in terms of its location, convenience and access to recreational waterbodies. Rental rates also take into consideration the value of the upland property in terms of its geographic advantages, the value of the improvements to the upland property and amenities available thereon, and the value of the improvements to the submerged land in terms of the structures and services offered, as well as the costs of operation of the docking facility. The slip rental fees are also dependent upon whether the particular marina is financially supported entirely by wet slip rentals or whether other services, such as repair and maintenance fees, fuel charges, charges for dry storage, or even upland facilities and activities comprise the bulk of its revenues. It is thus possible for two adjacent marinas or docking facilities which occupy the exact same amount of sovereignty submerged land to have a wide variance in the fees charged for wet slip rentals. Under the proposed total potential revenue formula, lease fees per linear foot may vary from marina to marina in the same geographic location, depending upon the weighted average per linear foot of slip rental charged by each marina in the preceding year.

## CONCLUSIONS OF LAW

As the owner and operator of a marina located upon sovereignty submerged lands and operated pursuant to a license agreement, petitioner is substantially affected by an existing rule which requires conversion to a lease upon the expiration or renewal date of the license and by a proposed rule which establishes the fees and payments for such a lease. Petitioner thus has standing to challenge the validity of existing Rule 16Q-21.05(1)(b) and proposed Rule 16Q-21.11, pursuant to Sections 120.56 and 120.54(4), Florida Statutes.

### RULE 16Q-21.05(2)(b)

This Rule, which was adopted in its present form on August 1, 1983, mandates that all activities on sovereignty lands require a lease, easement, consent of use or other form of approval. Among the enumerated activities which require a lease as a form of approval are

"existing licenses upon the date of expiration or renewal." It is this portion of the Rule which petitioner contends constitutes an invalid exercise of delegated legislative authority. Petitioner urges that the challenged rule is arbitrary and capricious and constitutes an excessive exercise of the authority delegated to the Board of Trustees of the Internal Improvement Trust Fund. It is also alleged that the Board's difference in treatment between exempt grandfathered structures and licensees required to convert to leases is irrational and bears no reasonable or logical relationship to fact or law. In making these contentions, petitioner relies upon the express language in its license agreement with the Board of Trustees, the long-standing policy of the Board in annually renewing marina licenses and the petitioner's own expenditure of funds in reliance on its right to renew its license on an annual basis.

Respondent contends that the challenged rule is a valid and reasonable exercise of the Board's fiduciary and management authority and responsibilities over sovereignty lands, and that petitioner and other marina owners are not entitled to perpetual licenses to use such lands.

The Legislature delegated to the Board of Trustees the authority to administer all state-owned land and directed the Board to create an overall plan concerning the acquisition, management and disposition of state-owned lands so as to ensure maximum benefit and use. Rulemaking authority was conferred upon the Board for these purposes. Section 253.03(7), Florida Statutes. Pursuant to this authority, the Board's policy with respect to commercial docking facilities on state-owned submerged lands has evolved through four stages over the years. Prior to March 10, 1970, no license, lease or fee was required for structures or commercial activities conducted over state-owned submerged land. For structures built subsequent to March 10, 1970, an annually renewable license at a fee with a capped allowable increase was required. This annual license was renewable so long as the licensee paid the license fee and complied with the remaining terms and conditions of the license. Structures built prior to March 10, 1970—grandfathered structures—were not required to enter into such license agreements. In approximately 1975, the third policy stage commenced. The Board began requiring a 5-year lease for the use of sovereignty submerged lands. Such leases were renewable at the option of the Board. The original lease fees were identical to the license fees. Again, grandfathered structures were not required to obtain a lease unless they were still in existence on January 1, 1998. Though not specifically exempt by the prior rule on the subject, licensees were not required to convert to leases and the Board continued to accept the payment of the annual

**205**

license fees from the licensees. The annual lease fees increased over the ensuing years to $0.045 per square foot in 1982 and to $0.065 per square foot in 1983. It was not until 1979 or 1980 that the Board began to exercise its option to increase the license fees by the 10% annual maximum cap. Licenses continued to be renewed under the terms of the license agreements at least through August of 1983, and were not required to pay the higher fees required for leases. The fourth stage began with the adoption of the challenged Rule 16Q-21.05(1)(b)4 on August 1, 1983 wherein existing licenses were required to convert to leases upon the date of expiration or renewal of the license. Again, grandfathered structures were exempt from the lease requirement except upon sale, reassignment or other form of conveyance or transfer.

A review of the Board's prior policies and actual practices with regard to the form of approval required for the use of state-owned submerged land for commercial docking facilities reveals that the Board has always, prior to a change in policy, given due regard to rights which have vested, either by previous usage or by contract. When licenses began to be required, previous structures were grandfathered. When leases became the new policy, previous structures were grandfathered and licensees were permitted to annually renew their licenses at the fee and terms set forth in their license agreement. This policy continued for some eight years after the lease policy became effective and thirteen years after the license policy became effective. The Board then, by Rule, extinguished this right of renewal at a fixed maximum fee, and required conversion to a lease at a higher fee and renewable only at the option of the Board. Such action constitutes an arbitrary and capricious exercise of the Board's delegated legislative authority. It also conflicts with the Board's own Rule 16Q-21.02(2), Florida Administrative Code, requiring that its rules regarding sovereignty submerged lands management are to be prospective in their application.

Counsel for the respondent argued at the hearing that license agreements entered into between the Board of Trustees and the owners and operators of marina facilities between 1970 and 1975 cannot be considered "licenses in perpetuity," and therefore the Board has the authority to require conversion to leases. While perpetual licenses or leases are disfavored, the determining factor is still the intention of the parties as expressed at the time of execution of the instrument and as exemplified by the action of the parties subsequent thereto. *Sisco v. Rotenberg*, 104 So.2d 365 (Fla. 1958); *Hutson v. Knabb*, 212 So.2d 362 (Fla 1st DCA 1968); and *Sheradsky v. Basadre*, 452 So.2d 599 (Fla.

**206**

3rd DCA, 1984). Here, the language of the standard license utilized by the Board is clear. It is renewable annually so long as the licensee complies with the terms and conditions of the license agreement. The fee is set, with a permissible 10% annual increase, as is the time for payment of the fee. The instrument itself clearly exhibits an intent to provide for more than one renewal. This is further illustrated by the thirteen-year course of conduct between the petitioner herein and the Board of Trustees. The petitioner expended over $200,000 in improvements in reliance upon its right to renew and the respondent accepted the renewal fees for 13 years. To arbitrarily extinguish this right of renewal by a rule which requires conversion to a different form of agreement with different terms constitutes an invalid exercise of delegated legislative authority. No reason whatsoever was advanced for exempting grandfathered structures from the lease requirements until 1998 and, at the same time, requiring annually renewable licenses entered into prior to 1975 to immediately convert to leases with higher fees and renewable only at the option of the Board. Statutes must be interpreted prospectively, and there was no evidence presented by the respondent that new factual changes have occurred which would support a deviation from the Board's prior interpretation of its management responsibilities and duties with regard to state-owned land. See *State, Department of Insurance v. Insurance Services Office, et al*, 434 So.2d 908 (Fla 1st DCA, 1983). While the Board was delegated the authority to adopt rules to ensure the maximum benefit and use of state-owned lands, it was not delegated the authority to unilaterally revoke a license agreement or to terminate vested rights by the adoption of a rule.

Finally, respondent argues that even if a previously executed annually renewable license agreement cannot be revoked or required to be converted to a lease, it is the application of the challenged rule to such a license which would be invalid and not the rule itself. If it were possible to interpret Rule 16Q-16.05 so as to exempt therefrom those standard licenses which contain an annually renewable clause entered into prior to 1975 or prior to the lease policy of the Board, the undersigned would agree that any misapplication of the Rule in that fashion would be the subject of a proceeding brought pursuant to Section 120.57, Florida Statutes. However, there is nothing in the challenged rule which would allow such an interpretation. The Rule specifically requires a lease for existing licenses upon the date of renewal. The only exemption from the lease requirement for commercial marinas are grandfathered structures, which were never required to

**207**

obtain licenses.[1] It is clear that the agency itself has interpreted the challenged Rule to require current licenses which contain the annually renewable provision to convert to a lease, as exemplified by the November, 1983 letter referred to in paragraph 9 of the Findings of Fact. The challenged Rule does not purport to reserve to DNR or the Board of Trustees the discretion to determine if a license must be converted to a lease. It is inflexible and clear on its face in requiring all licenses to be converted to leases. To that extent, Rule 16Q-21.05(1)(b)4 constitutes an excessive and invalid exercise of delegated legislative authority.

### Proposed Rule 16Q-21.11

As pertinent to this proceeding, Rule 16Q-21.11, Florida Administrative Code, sets forth the fees to be charged for leases of sovereignty submerged lands. The challenged amendment proposes to change the fee policy of charging a uniform base rate per square foot to a fee of either that base rate ($0.065 per square foot) or a percentage (7%) of total potential annual revenues from the wet slip rental areas, whichever amount is greater. The total potential annual revenues are to be based upon the previous years' monthly per linear foot rental rate, and ancillary charges, such as dues or membership fees, are to be proportionately factored into the monthly rental rates. Another proposed rule, not here challenged, defines the "wet slip rental area" as those wet slips or other boat mooring areas within the lease area which could be used for rental.

Petitioner contends that the proposed amendment to Rule 16Q-21.11 is invalid for several reasons. It is urged that a lease fee based upon a percentage of total potential revenues is arbitrary, capricious and discriminatory and bears no reasonable relationship to either reality or the fair rental value of state-owned submerged land. It is also contended that the Economic Impact Statement accompanying the proposed amendment is inadequate, incomplete and erroneous.

The respondent replies that basing lease fees on revenues generated by a private marina operator is a rational and sound exercise of the discretionary and fiduciary responsibility statutorily placed upon the respondent. It is urged that it is equitable to base compensation for use of state-owned land upon revenues generated, and that the appraisal approach would be impracticable due to the State's monopoly of

---

[1] While not specifically challenged in this proceeding by Rule number, it is to be noted that Rule 16Q-21.04(1)(i), Florida Administrative Code (1983 Annual Supplement) requires that "all existing licenses shall be converted to leases upon the expiration or renewal date of the license."

ownership of sovereignty lands. It is further urged that since the rental value of land and the appraised value of land is different, it would not be practicable to base the lease fees on the appraised value of both the upland and the submerged properties. Respondent also contends that the costs of obtaining appraisals would be prohibitive. Respondent attempts to justify its use of a percentage of potential, as opposed to actual, revenues on the ground that such an approach would eliminate the necessity to perform annual certified audits.

The undersigned has carefully considered the testimony and arguments of counsel with regard to the proposed lease fee structure, and concludes that an attempt to base lease fees upon a percentage of total potential revenue constitutes an invalid exercise of delegated legislative authority. The Board of Trustees is authorized to charge an equitable fee for the private use of state-owned land to compensate the public for a loss of the use of such land. However, to base lease fees upon what the lessor could potentially realize from his investment (both on the upland property and on the submerged land structure itself) bears no connection with reality and is therefore irrational, illogical and arbitrary. A fee not based upon either actual space occupied or actual revenues received or generated does not result in equitable compensation for the use of state-owned land.

It was established that utilization or occupancy rates among individual marinas vary greatly. General economic conditions may cause a particular marina to experience a high or low occupancy rate from year to year. The potential revenue approach fails to consider this occupancy factor. Obviously, the revenue a marina derives from slip rentals is dependent upon the extent of utilization of its wet slip spaces. A marina which experiences a fifty percent occupancy level will be required to pay much more in lease fees than seven percent of its actual revenues than a marina which enjoys a one hundred percent occupancy level. To base a lease fee upon what the lessor could conceivably earn is irrational and bears no relationship to equitable compensation for the use of the state's submerged land. A rule which bears no reasonable relationship to reality is arbitrary and invalid. The potential, as opposed to actual, revenue approach was apparently chosen to avoid the necessity of auditing the marina's records. Ease in administration does not justify the adoption of an unreasonable and arbitrary rule. If the state chooses to base its lease fees on revenues, the determination of the amount of such revenues must be based upon reality. A formula which fails to consider actual gross revenues or occupancy levels is illogical and irrational.

The land appraisal approach to determining the proper amount of

**209**

lease fees was rejected primarily because of the expense and difficulty of obtaining the appraisals. Again, ease of administration does not provide a justification for an arbitrary policy. This justification is also difficult to understand in light of the fact that subsection (1)(b)9 of the proposed Rule reserves to the Department the discretion to use the appraisal approach for determining lease fees for restaurants and other nonwater dependent uses.

The Economic Impact Statement prepared for the proposed amendments to Rule 16Q-21.11 is incomplete insofar as it fails to contain a statement estimating the Rule's effect upon competition in the marina industry. Obviously, the marina which pays no lease fee (grandfathered structures) enjoys some competitive advantage over the marina which pays over $6,000.00 a year for the privilege of using submerged land. In other respects, the undersigned finds that the EIS substantially complies with the requirements of Section 120.54(2), Florida Statutes.

## FINAL ORDER

Based upon the findings of fact and conclusions of law recited herein, it is ORDERED that subsection (1)(b)4 of existing Rule 16Q-21.05, Florida Administrative Code, and subsection (1)(a) of proposed Rule 16Q-21.11, as published in Volume 10, Number 8 of the Florida Administrative weekly (February 24, 2984), constitute invalid exercise of delegated legislative authority.

12. DEPARTMENT OF NATURAL RESOURCES
Division of State Lands

| RULE TITLES: | RULE NOS.: |
|---|---|
| Definitions | 16Q-21.03 |
| Payments and Fees for Standard Lease, | |
| Easement and Severed Dredge Materials | 16Q-21.11 |

PURPOSE AND EFFECT: The Purpose of this rule is to establish a framework for more equitable compensation to the Board of Trustees of the Internal Improvement Trust Fund for exclusionary uses of state-owned submerged lands. This rule is pursuant to, and necessary for the implementation of Chapter 253.03(7), Florida Statutes.

SUMMARY: The rule establishes a new formula for the calculation of standard annual lease fees for proposed public and private uses of state-owned submerged lands. The standard annual lease fee would be 7 percent of the total potential annual revenues from the wet slip rentals or the base fee, whichever is greater. The current base fee of $0.065 per square foot would remain the same. Marinas and other facilities open to the general public would receive a 30 percent discount; thus, having a base rate of $0.0455 per squre foot or 4.9 percent of the total annual revenues. The lease fees for over-water restaurants and other nonwater dependent uses would be negotiated by the Department on a case-by-case basis.

Amendments to the proposed rule may be presented to the Department for their consideration at the hearing listed below and to the Governor and Cabinet sitting as the Board of Trustees of the Internal Improvement Trust Fund for their consideration and possible adoption.

RULEMAKING AUTHORITY: 253.03(7), and 253.73, Florida Statutes

LAW IMPLEMENTED: 253.03, Florida Statutes

SUMMARY OF THE ESTIMATE OF ECONOMIC IMPACT OF THE RULE: The proposed rule will increase revenues from submerged land leases and provide a more equitable assessment of fees throughout different regions of the state. There will be an increase in lease fees for certain existing and new lessees. The amount of increase, if any, will be directly proportional to the lessees' rental rates for wet slips. Generally speaking, the fee increases over the current existing base rate will be higher in the South Florida Coastal areas and lower in the Northwest and Northeast Florida area. Some lessees in certain rural and low rental rate areas will remain at the current base rate and experience no fee increase.

PUBLIC WORKSHOP WILL BE HELD BY THE DEPARTMENT OF NATURAL RESOURCES AT THE RESPECTIVE TIME, DATE AND PLACE SHOWN BELOW:

TIME AND DATE: 1:00 p.m., March 13, 1984

PLACE: Department of Natural Resources, Marjory Stoneman Douglas Building, Rm. 302, 3900 Commonwealth Boulevard, Tallahassee, Florida 32303

A PUBLIC HEARING WILL BE HELD BY THE GOVERNOR AND CABINET SITTING AS THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND AT THE RESPECTIVE TIME, DATE AND PLACE SHOWN BELOW:

TIME AND DATE: 9:00 a.m., March 20, 1984

PLACE: The Capitol, Lower Level Meeting Room, Tallahassee, Florida 32301

THE FULL TEXT OF THE PROPOSED RULE IS AS FOLLOWS:

16Q-21.03 Definitions.

(39) "West slip rental area" those wet slips or other boat mooring areas, within the lease area, which could be used for daily, weekly, monthly or annual rental. The total linear feet in the wet slip rental area will be computed as the sum of the lengths of each slip or mooring area; including the distances out to the ends of catwalks or mooring pilings.

Specific Authority 25J 03(7) FS Law Implemented 253 03 FS History—New 9-26-77, formerly 16C 12 01 and 16Q-17.01 Amended 3 27 82, 8-1 83, _____

16Q-21.11 Payments and Fees for Standard Lease, Easement and Severed Dredge Materials.

(1) Standard Leases.

(a) Standard Fee Formula.

1. The standard annual lease fee shall be 7 percent of the total potential annual revenues from the wet slip rental area or the base fee whichever is greater. The total potential revenues will be calculated by multiplying the total number of linear feet for rent in the wet slip rental area times the weighted average monthly per linear foot rental times 12. The weighted average per linear foot rental will be derived from the monthly rates (seasonal rates included). Any ancillary charges, such as membership fees, dues, or miscellaneous fees which are required to rent a wet slip, shall also be proportionately factored into the average monthly rate. The base rate will be calculated according to part (b) of this section.

2. The monthly rental rates used to determine the weighted average will be derived from posted price sheets or other information from the previous year which will be certified true and correct by the lessee. The calculated rate shall be reviewed and adjusted annually on the anniversary date of the lease.

3. For new facilities, the base rate shall be charged upon approval of the lease. The percent of total potential revenues fee will be applied when the facility is certified complete by the lessee or when any rentals occur, whichever comes first.

4. Docking facilities which are open to the public on a first come, first served basis shall be allowed a discount as outlined in paragraph (b) 2. of this section.

5. Docking facilities in aquatic preserves may be subject to the surcharge as outlined in paragraph (b) 8. of this section.

6. For docking facilities which are not predominantly commercial wet slip rental operations such as private clubs, condominium, motel and restaurant docks, the Department shall first consider the weighted average per linear foot rental rate derived from commercial marinas in the same county or other comparable geographic areas to establish the rental rate for the lease fee. The Department shall compile rental data from existing leases and select the appropriate comparable rental rate. In the event that the standard lease fee formula does not appropriately fit the proposed use, the Department may negotiate a fee on a case by case basis.

(b) Base Fees, Discounts, Surcharges and Other Payments.

1. The annual lease base fee shall be computed at a base rate of $0.065 per square foot.

2. There shall be a discount of 30 percent per square foot per year on the standard annual lease fee for all leases that are open to the public on a first come, first served basis. Marinas constructed in conjunction with owner occupied multi-family residential buildings, shall be considered open to the public on a first come, first serve basis if no less than 50 percent of its berths are made available to the general public on a rental basis. To be eligible for this discount, the lessee shall notify the Department of all changes in wet slip rental rates within 30 days and shall display its revised fee schedule in a location clearly visible and accessible to the public.

3. An additional 20 percent of the lease base fee shall be charged for the first annual fee on all leases. This additional fee is a one time payment which is not credited toward any total potential revenues payment.

4. The per square foot base rate shall be revised March 1 of each year and increased or decreased based on the Consumer Price Index-All Items pursuant to paragraph 6. below.

5. The base rate for all new leases shall be determined according to the appropriate base rate schedule for the year in which the lease is granted.

6. The base rate charged for individual leases shall be adjusted annually based upon the average increase in the Consumer Price Index-All Items for the previous five years with a 10 percent cap.

7. There shall be a minimum annual fee of $225.00.

8. A rate of two times the existing rate shall be applied to aquatic preserve leases where 75 percent or more of the subject lease shoreline and the adjacent 1,000 feet on both sides of the lease area is in a natural, unbulkhead, nonseawalled or nonripraped condition. A rate of up to three times the base rate may be used in Class 1 or 2 Resource Protection Areas as designated in an aquatic preserve management plan adopted by the Board.

9. The lease fees for restaurants and other nonwater dependent uses shall be negotiated on a case by case basis by the Department. In negotiating the lease fee, the Department may consider the appraised market rental value of the riparian upland property and the enhanced property value, benefits or profit gained by the applicant if the proposed lease is approved. Nonwater dependent uses shall be assessed a fee that is ten times the appropriate base rate or a fee calculated by multiplying the square footage of the preempted area times the appraised per square foot value of the unimproved adjacent upland property times ten percent, whichever is greater. The fees shall be adjusted annually pursuant to either 16Q-21.11(1)(d) or the revised annual assessed value as appropriate. Grandfathered nonwater dependent uses shall be treated as water dependent uses when grandfathered status is lost for any reason.

10. Waivers, partial waivers, or exclusions from payment of the lease fees for government, research, educational or charitable organizations may be granted by the Board in the event that the proposed uses are in the public interest.

11. If a facility occupies sovereign submerged lands portions of which are exempted from payment by virtue of grandfathered status and portions of which are leased, and grandfathered status is lost, the lease fee and rate schedule for the entire property shall be the appropriate lease fee or base rate at the time the renegotiated lease is executed.

12. There shall be an assessment for prior unauthorized use of sovereignty land for after-the-fact lease applications. The minimum assessment for such applications shall include:

a. Payment of retroactive lease fees;

b. Payment of an assessment computed as the number of square feet in the lease area times the lease fee per square foot at the time construction was commenced times ten; and,

c. Payment of an additional annual percentage on retroactive lease fees and on the assessment calculated under 2., (b) 1. and 2. computed at a rate of 12 percent. Such rate shall be adjusted annually to a rate equal to the two percentage points above the Federal Reserve Bank discount rate to member banks.

13. The Board may, at its discretion, consider equities and particular circumstances on a case by case basis to determine whether an adjustment of the assessment provisions set forth in 12. above would be warranted and may increase or lower the assessment accordingly.

14. Any grandfather structures which are not registered according to this rule shall lose any grandfathered rights.

15. Any grandfather structures which are not registered according to this rule shall be considered a prior unauthorized use as of June 30, 1984, and may be treated according to the provisions of this section.

Specific Authority 253.03(7), 253.73 FS. Law Implemented 253 03, 253.71 FS. History—New 3 27-82, Amended 6-16-82, 8-1-83, _____.

NAME OF PERSON(S) ORIGINATING PROPOSED RULE: Ted Forsgren, Bureau Chief of State Lands Management
NAME OF SUPERVISOR OR PERSON(S) WHO APPROVED THE PROPOSED RULE: Elton Gissendanner, Executive Director, Department, of Natural Resources
DATE PROPOSED RULE APPROVED: 2-17-84